**Affirmed and Memorandum Opinion filed October 11, 2011.**



**In The**

# Fourteenth Court of Appeals

_____

**NO. 14-10-00200-CR**
_____

**DANIEL JAMES GRAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 06CR1249**

## MEMORANDUM OPINION

A jury found appellant, Daniel James Gray, guilty of capital murder and the trial court imposed the mandatory sentence of lifetime confinement in the Texas Department of Criminal Justice, Institutional Division without the possibility of parole. *See* Tex. Penal Code Ann. §§ 12.31(a), 19.03(a)(2) (West 2011). Finding no error, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In the early morning hours of December 22, 2005, paramedics and police officers responded to a 9-1-1 call from apartment C of the Blackbeard Apartments located in Galveston County. The call reported that a four-year old boy, K.J., had been found dead

in his bedroom closet. Upon arrival at the apartment, the paramedics and police found K.J. lying on the living room floor with appellant administering CPR. Barbara Bawarsky, K.J.'s grandmother, and his two-year old sister were also present in the apartment. The police determined K.J.'s death was suspicious and an investigation began immediately.

On April 28, 2006 both appellant and Bawarsky were charged with capital murder. Eventually Bawarsky entered into a plea agreement with the State. In exchange for her truthful testimony, Bawarsky agreed to plead guilty to murder and she would receive a sentence of forty years' confinement.[1] Because appellant has challenged the sufficiency of the evidence corroborating Bawarsky's accomplice witness testimony, we present her testimony separate from the remainder of the evidence.

## I.    Non-Accomplice Evidence

### A.    K.J.'s Father

Matthew, K.J.'s father, was the first witness to testify. Matthew met K.J.'s mother, Ginger, when both were in high school in the Fort Worth area. K.J. was born on August 5, 2001 when Matthew was 15 or 16. Matthew and Ginger also had a daughter, L.J., who was two in December 2005.

Eventually Matthew and Ginger married and during much of their marriage they lived with Ginger's grandmother. They separated in 2004 or early in 2005 and Matthew moved out. Matthew testified that he assumed Ginger and the children continued to live with Ginger's grandmother after he moved out.

---

[1] Bawarsky also pled guilty, and was sentenced to serve time on, several other charges including: endangering a child, manufacturing and delivery of a controlled substance, possession of a chemical with intent to manufacture a controlled substance, and misdemeanor theft by check. Under the agreement, the sentences on each charge would be served concurrently.

After Matthew vacated the premises, he was informed that Ginger was abandoning the children by leaving them with various people. According to Matthew, as a result of Ginger's behavior, Bawarsky, her mother, reported Ginger to CPS. CPS intervened and removed the children from Ginger's custody and placed them with Bawarsky. Bawarsky and the children initially lived in the Fort Worth area but she eventually moved with the children to Galveston. According to Matthew, Bawarsky was awarded conservatorship of both children sometime in 2005.

Matthew also testified about K.J.'s behavior while he was still married to Ginger. Matthew described K.J.'s behavior when he was two years old as "just like any other kid, two years old, just terrible twos, just normal outbursts." Matthew did testify that he was concerned with K.J. having Attention Deficit Disorder and hyperactivity, conditions Matthew suffered from. Despite that concern, Matthew never saw K.J. bang his head on the wall or engage in similar conduct likely to cause himself injury.

Once Matthew had separated from Ginger, he had limited contact with the children, but he remained in contact with Bawarsky. According to Matthew, Bawarsky told him that she had caught K.J. fondling his younger sister and that he was acting out in school. Bawarsky also told Matthew that she was taking K.J. to counseling for his behavior issues.

Matthew last saw K.J. in late November or early December 2005 when Bawarsky came to the Dallas-Fort Worth area to pick up Matthew's child support check. Matthew visited with K.J. and did not notice any unusual bruises or any other sign that would indicate K.J. was being abused. In fact, Matthew testified that he never saw any bruises or marks on K.J. during any of his monthly visits.

Bawarsky called Matthew on December 22, 2005 and told him that K.J. was dead. Bawarsky explained that she went into K.J.'s room and did not see him so she looked in the

closet and found him bleeding out of his nose and mouth. Bawarsky further explained that they tried to resuscitate K.J.; but those efforts were unsuccessful.

Bawarsky called Matthew several times on December 22 and in one of the calls she asked him to bring his $200 child support check because she could not get back into her apartment and that would be the only money she had.

Matthew testified that he had no suspicion Bawarsky was using any kind of drugs. Finally, Matthew did not recall Bawarsky ever asking him to take K.J. to live with him.

**B.     CPS Workers**

Two Texas Department of Family and Protective Services ("CPS") workers testified during appellant's trial: Johnette Findley and Amy Ballinger. Findley, based in Galveston, worked in the "I See You Program." In that role, Findley would visit homes where children had been placed with relatives or fictive kin. In April 2005 Findley was assigned the responsibility of checking on Bawarsky and K.J.

Findley generally scheduled monthly visits with Bawarsky to check on K.J. and his sister.[2] Findley noticed two bruises on K.J. during her May 2005 visit. However, K.J. explained that one of the bruises was the result of a boy at daycare hitting him and the second bruise was the result of his running into a wall. Findley did not observe bruises on K.J. during any of her other visits.

Findley's last visit with Bawarsky occurred in October 2005. The visit took place at the Blackbeard Apartments. When she arrived, Findley encountered appellant leaving the apartment. Appellant introduced himself as a boyfriend and explained he was present

---

[2] Findley was unable to visit with Bawarsky and K.J. in September 2005 because they had evacuated Galveston in response to a hurricane.

at Bawarsky's apartment to accept delivery of a telephone. When Bawarsky arrived, Findley met with K.J.'s sister but Bawarsky explained that K.J. was not feeling well when they had returned to Galveston after the hurricane so he had remained in Fort Worth with Bawarsky's mother. Findley then asked Bawarsky about appellant and she admitted he was her boyfriend but specifically told Findley he was not living in the Blackbeard apartment with her.

Findley testified Bawarsky never mentioned anything about K.J. fondling his sister. In addition, Findley did not see any indicators of drug abuse by Bawarsky and she never suspected Bawarsky was using drugs.

Findley called Bawarsky to schedule her November visit and learned Bawarsky had already been designated permanent managing conservator earlier that month. As a result of this change, Findley and CPS's involvement came to an end.

Ballinger visited with K.J. in October 2005 at his great-grandmother's house in Fort Worth. According to Ballinger, K.J. was very active, running around, and excited to see her. In addition, she testified K.J. did not have any "visible scratches, bruises, nothing that seemed to be concerning physically or mentally."

### C.    Medical First Responders

Numerous paramedics and emergency medical personnel responded to Bawarsky's early morning 9-1-1 call.

### 1.    Steven Spicer

Steven Spicer was the Jamaica Beach fire chief. Spicer testified he was dispatched to the apartment complex in Jamaica Beach about 4:00 a.m. on December 22, 2005. When Spicer, along with another EMT, arrived at the apartment, he found a young boy

laying on the floor. According to Spicer, the boy "was not clothed, not moving, and there was a gentleman over the top of him attempting to do CPR." Spicer asked the man to move and checked the boy for a pulse and for breath sounds. Despite finding no pulse and hearing no breath sounds, Spicer and the other EMT started performing CPR. Spicer continued the CPR until the paramedics arrived.[3] Spicer estimated he performed CPR for fifteen to twenty minutes.

When asked to describe the condition of the boy, Spicer testified the first thing he noticed was that rigor mortis had already set in. When asked what effect that had, Spicer testified that if CPR had not been started before their arrival, he would not have started performing it because, as indicated by the onset of rigor mortis, the boy had been dead too long. Spicer also testified that he noticed blood was coming out of the boy's mouth and he was covered in bruises. Spicer testified that when the Galveston paramedics arrived, they attempted to intubate the boy but they were not successful because his jaw was locked as a result of rigor mortis.

Spicer noticed there was also an adult female present in the apartment. According to Spicer, after he asked the man performing CPR to move away from the boy, he stood next to the female about ten to fifteen feet away. Spicer did not observe any type of emotional reaction from either the man or the woman during the approximately two and a half hours he was present in the apartment. Spicer did notice the man and the woman appeared to be in conversation, but he could not hear what they said.

---

[3] Spicer testified that he was a basic EMT and that a paramedic has more training and is qualified to perform more actions when treating a patient. Spicer likened a paramedic to a "mobile emergency room." According to Spicer, if CPR has been started, they must continue performing it until a paramedic obtains clearance to stop CPR.

6

### 2.      Katherine Wahl

Katherine Wahl testified that in 2005 she worked as an EMT basic for Galveston EMS and she served as a volunteer fire fighter for Jamaica Beach.   During the early morning hours of December 22, 2005, Wahl was at home when Chief Spicer called her to assist him in the emergency call he was making.   Wahl arrived at the Jamaica Beach apartment within a few minutes of receiving the call.   Despite her quick response to Chief Spicer's call, she arrived at the apartment after Galveston EMS had reached the scene.

When Wahl entered the apartment, she found Chief Spicer performing CPR on a child laying on the living room floor.   In addition, she noticed Laurie Roth, a Galveston paramedic, on the phone and several other members of Galveston EMS in the apartment. Wahl observed one of the paramedics attempt to intubate the boy but he was unable to do so because the boy's jaw was clenched shut as a result of rigor mortis.[4]   Wahl also observed Officer Moore of the Jamaica Beach Police Department at the scene when she arrived.   According to Wahl, Sergeant Hubble of the Jamaica Beach Police Department was either on the scene when she got there or arrived soon after she did.   Wahl also observed the residents of the apartment.   She saw an older man, an older woman, and a girl about two-years old.   According to Wahl, the man and woman were dressed in street clothes and they kept going back and forth between the bedrooms and the little girl.

After Wahl had arrived in the apartment, Roth told them to stop the CPR.   At that point Wahl was able to observe the boy on the floor.   According to Wahl, the boy was very pale and he had multiple bruises.   Wahl noticed he had his right leg bent up.   She tried to straighten it, but was unsuccessful.   When she tried to straighten the boy's right leg, Wahl noticed his foot was ice cold and the knee would not bend.   Wahl described this as a sign

---

[4] Wahl testified that rigor mortis is a definite sign of death and her experience was that it usually sets in a couple of hours after death.

of rigor mortis. She also noticed the boy was naked and had blood around his mouth and on his fingers.

Once CPR had been stopped, the paramedics and other emergency medical personnel were ordered out of the apartment. Sergeant Hubble asked Wahl to remain with the young girl until CPS arrived. In addition, Wahl was asked to take Bawarsky's blood pressure. While doing that, Wahl observed that Bawarsky was not crying and was not necessarily in shock, but she appeared to be scared. When asked what she observed of the adult male present in the apartment, Wahl testified "he was trying to be like super cooperative."

### 3.    Michael Cody Anderson

Anderson worked as a fire fighter and EMT basic for the Galveston Fire Department in 2005. Anderson was one of the first responders who went to the Jamaica Beach apartment in response to Bawarsky's 9-1-1 call.

Upon arrival in the apartment, he noticed a naked little boy laying on the floor. Anderson noticed there were bruises all over the boy's body and he observed a little bit of blood.[5] He also observed rigor mortis had set in and that meant "it had been a couple of hours since he had been deceased." According to Anderson, the boy's entire body was stiff and both legs were bent.

Anderson testified he heard the adult male resident of the apartment say that the boy had thrown a fit before it was time to go to sleep.

---

[5] Anderson could not recall the location of the blood.

8

### 4. Laurie Lynn Roth

Roth testified she was a paramedic with Galveston EMS and had served in that role for almost twelve years. According to Roth, she arrived at the Jamaica Beach apartment at 4:05 on the morning of December 22, 2005. Roth was met at the door by Jamaica Beach police officer Moore who told her she needed to go in, confirm the boy's death, and come right back out of the apartment.[6] Roth went into the apartment where she saw Spicer performing CPR on the boy. Roth testified that as a paramedic, she must continue life saving efforts until it is confirmed there is a death and she has talked to medical control, in this instance, a doctor at UTMB. According to Roth, she checked for a pulse and signs of breathing and finding neither, life saving efforts were discontinued approximately five minutes after she arrived on the scene.[7]

Roth testified that, after working on the complainant for a few minutes, she noticed he was very cold to the touch, his legs were bent at a 45-degree angle and would not go down. Based on this, Roth concluded that rigor mortis had set in. Roth also observed several bruises on K.J.'s body and noticed there were blood smears on his face, chest, and left arm. In addition, Roth, without changing the position of the body, observed that lividity had set in, which, in this case, meant blood had pooled in certain areas of the complainant's body. Roth testified that blood had pooled in the complainant's ankles, feet, left arm, and the left side of his face.

Roth testified next about the other occupants of the apartment that morning. Roth noticed an adult male standing in the background. In addition, she found an adult female

---

[6] Officer Moore was the first police officer to arrive on the scene. Moore died shortly before appellant's trial began.

[7] Roth testified that prior to ceasing life saving efforts, her partner tried to intubate the complainant, but his efforts were unsuccessful as the boy's jaw was clenched shut. In addition, Roth testified she performed an EKG on the complainant to check for heart activity, but the EKG showed a flat line, which indicated there was no heart activity.

9

with a young female child in the bedroom. Roth went into the bedroom and told the female there was nothing else they could do for the boy. According to Roth, the adult male and female remained separated and she did not observe any loud outbursts or confrontations between them.

### D. Sergeant Steve Hubble

In December 2005 Hubble served as a patrol sergeant for the Jamaica Beach Police Department. About 4:20 a.m. on December 22, 2005 Hubble was called to the Blackbeard Apartments by Officer Moore. Hubble arrived at Apartment C a few minutes later.

Officer Moore was already on the scene when Hubble arrived. In addition to numerous EMT's and paramedics, Hubble saw appellant and Bawarsky in the apartment. According to Hubble, appellant and Bawarsky were separated into different bedrooms inside the apartment. Both appellant and Bawarsky appeared calm and unemotional. He noticed both appellant and Bawarsky were dressed when he arrived. According to Hubble, Bawarsky was wearing sweatpants, a sweatshirt, and socks without shoes while appellant was wearing a gray and white shirt, blue jeans, socks, and sandals. Hubble did not see any blood on appellant or Bawarsky. In addition, their clothes did not appear wet. According to Hubble neither appellant or Bawarsky mentioned anything about taking the boy to the bathtub before they brought him out to the living room.

Believing the boy's death was suspicious, Hubble left the apartment soon after he arrived to call his police chief and the Galveston County Sheriff's Department to assist in the investigation. After making those calls, Hubble went back inside the apartment where he spotted appellant and Bawarsky together talking in the living room. While Hubble could not hear the conversation, it appeared to Hubble that appellant was trying to convince Bawarsky of something. To prevent them from corroborating information, Hubble instructed Moore to separate the two. Initially Moore placed them on different sides of the

combination living and dining room and eventually sent them out to opposite sides of the apartment's front porch. At some point in time after they had moved to the front porch, Hubble saw appellant standing over Bawarsky "pointing his finger at her as if he was scolding her." Hubble then instructed appellant to move back to the other side of the porch.

Later, about 5:00 a.m., Hubble was standing next to Bawarsky and she talked about K.J.'s previous behavior and appearance when he died. According to Hubble, Bawarsky said "[K.J.] threw tantrums before and he went into the closet. He was an unruly child. His behavior was not out of the ordinary. He goes into the closet every other night." It was at that point Bawarsky started crying and said: "He turned red and died." Appellant then walked over and told Bawarsky: "It's not your fault. It's my fault." Hubble separated them again and observed that Bawarsky appeared agitated, anxious, and fidgety. Bawarsky then told Hubble she was bipolar and indicated she needed her medications from inside the apartment. Hubble testified he did not observe appellant and Bawarsky yelling or shouting at each other.

Hubble also canvassed the other residents of the Blackbeard Apartments. One of those residents was Michael Hudson, the resident living in the apartment above Bawarsky's.

## E.     Michael Hudson

Michael Hudson lived in Unit D at the Blackbeard Apartments, the apartment directly above Bawarsky's apartment. Hudson testified that four people lived in the apartment beneath him: two adults and two children. He identified appellant as the adult male living in the downstairs apartment. Hudson testified that he regularly heard a lot of screaming and shouting coming from the downstairs apartment as well as the sounds of fighting. According to Hudson, it was the two adults doing the shouting and screaming.

Hudson also heard appellant directing a lot of vulgar language at K.J. Specifically, Hudson heard appellant tell K.J. on at least three occasions: "I'm going to throw your little ass in the closet." According to Hudson, the verbal outbursts occurred on an almost daily basis.

Hudson also testified about noises he heard emanating from the bathroom in the apartment below him. Hudson said "a few times I actually thought somebody was fighting for their life or something, but I didn't know what to make of it…." During that fighting, he heard "Don't, don't do that" and then the little boy saying "okay, okay, okay."

Hudson then turned his attention to the night of December 21-22, 2005. Hudson testified that he was awakened between 3 and 4 o'clock on the morning of December 22 by a loud noise that sounded like someone hitting a wall in the apartment beneath him. The noise was so loud it caused Hudson to rise out of his bed. After getting out of bed, Hudson heard "hollering and screaming coming from below" his apartment. According to Hudson, it sounded "just like they were fighting bloody murder." After the loud thud, Hudson heard:

> "You son of a bitch. "You mother fucker." "You shit," you know, just vulgar like that, constant like that back and forth. And then it would stop. It would stop and then it would start back. This happened for the duration of the 15 minutes or whatever time it was and then it quit. And there was no more hollering and screaming after that period of time.

Hudson reached for the phone to call the police, but then decided to wait until after he had showered and would call if he still heard the noise at that point in time. After showering, Hudson got ready for work and when he opened the blinds on his front window, he saw emergency vehicles everywhere outside his apartment. A police officer came to his door soon thereafter.

12

**F.    Crime Scene Investigator Michael Bell and Related Evidence**

Investigators from the Galveston County Sheriff's Department's Identification Division were called to the scene soon after the first responders arrived. Michael Bell was the primary crime scene investigator. Bell arrived at the Blackbeard Apartments about 5:20 the morning of December 22, 2005. Bell finally left the scene at 7:10 p.m. that evening. Bell photographed the entire apartment.

During his investigation, Bell discovered a roll of socks with a reddish-brown stain on it in the top drawer of the dresser in the children's bedroom. The ball of socks was taken as evidence and submitted to the Texas Department of Public Safety Crime Laboratory ("DPS Crime Lab") for analysis. The serologist at the DPS Crime Lab initially examined the socks and discovered the roll contained four socks. He then collected stains from the socks and determined they were apparent blood. He then submitted the stains for DNA analysis. Christy Smejkal, the DNA analyst at the DPS Crime Lab, performed the DNA analysis on the sock stains and determined the DNA matched K.J.'s.

Bell also found a reddish-brown stain down the side of the bathtub. Bell, who had specialized training in blood and blood patterns, testified that the stain indicated a flow down the side of the tub due to gravity and there was an attempt to wipe through the stain. Bell collected a swab of the bathtub stain and that was submitted to the DPS Crime Lab for analysis. Smejkal tested the bathtub swab and determined the swab contained a mixture of K.J.'s DNA and appellant's DNA.

Bell located a reddish-brown stain on the bathroom floor beside the bathtub and another reddish-brown stain on the carpet in the master bedroom of the apartment. Bell collected samples from both stains and submitted them to the DPS Crime Lab for analysis. Smejkal's analysis revealed that the bathroom floor stain was a match for K.J.'s DNA.

13

Smejkal determined the master bedroom carpet stain contained a mixture of DNA. According to Smejkal, K.J. could not be excluded as a major contributor to the stain. In addition, Smejkal testified appellant and Bawarsky could not be excluded as contributors to the stain. Finally, Smejkal testified K.J.s' sister could be excluded as a contributor to the carpet stain.

During his investigation, Bell found sheets and linens in the apartment washing machine. Bell recovered a purple sheet that had been knotted in the center. He also found a bundle of sheets with a butterfly pattern that had been knotted, a large white sheet with several stains, and a mesh bag inside the washing machine. Bell recovered a child's extra small white t-shirt from the washing machine as well.[8] Each of these items was wet when Bell recovered them from the washing machine.

Each of the above items was submitted to the DPS Crime Lab for analysis. Smejkal analyzed the children's t-shirt and obtained a partial profile which was consistent with a mixture of K.J.'s and appellant's DNA. The bundle of sheets was actually four items tied together. The bundle included a light green sheet, a white sheet with a butterfly pattern, a receiving blanket with colored shapes, and a blue belt. The serologist submitted two samples taken from stains on one of the sheets. Smejkal determined that the DNA from one of those stains matched K.J.'s DNA.

---

[8] Bell recovered numerous items from the washing machine, which he described as very full. He provided a complete list during his trial testimony: a green and red comforter, two white fitted sheets, a white towel with multicolored stripes, a green towel, a blue towel, a double XL sized gray t-shirt, two pairs of child-sized blue jean pants, white children's pajamas, adult-sized blue jean cut-off shorts, a red towel, men's black boxer shorts, a white towel with multicolored design, and a child's blanket. Bell testified he also recovered the purple sheet, the bundled butterfly sheets, a mesh bag, and the children's t-shirt from the washing machine but he did not separate them out until after Bawarsky's December 28, 2005 videotaped walk-through statement. Bell testified he separated these items because Bawarsky had mentioned during her walk-through that K.J. had been wrapped in sheets and knotted sheets and that a mesh bag had then been placed over his head and that she had placed those items in the washing machine. Bell separated out the child's t-shirt because Bawarsky had mentioned they had ripped K.J.'s clothes off and placed those in the washing machine as well. According to Bell, the t-shirt he recovered from the washing machine was ripped and had a stain on it.

14

Bell also recovered five trash bags from the apartment dumpster. In one of the bags Bell discovered Sudafed and Equate brand pseudoephedrine over-the-counter medication packages. A second trash bag contained matchbooks, which were all missing the strike strips. According to Bell, these items, matchbook strips and pseudoephedrine, are used in the manufacture of methamphetamine. Bell testified that during his investigation, he observed chemicals used in drug manufacturing inside Bawarsky's apartment.

During his investigation in Bawarsky's apartment, Bell found a disposable camera. Bell eventually took the camera to the Montgomery County Sheriff's Department where the film was developed. Two of the pictures from that camera were admitted into evidence as State's Exhibits 6 and 30 during appellant's trial. Exhibit 6 was a photograph showing appellant wrapping K.J. in a butterfly patterned sheet. Bell found a sheet matching the butterfly sheet shown in the photograph inside the washing machine. Exhibit 30 was a photograph of K.J. sitting blindfolded in a small chair.

Bell also found several videotapes during his investigation of K.J.'s death. One of these videotapes was admitted into evidence during appellant's trial as State's Exhibit 77. State's Exhibit 77 was referred as the "Discipline Video" and it was played in its entirety for the jury during Bawarsky's testimony.

The Discipline Video was not dated, but Bawarsky testified it was made in early December. The Discipline Video shows appellant in K.J.'s face, yelling at him, and threatening him. K.J. was partially wrapped in a sheet, laying on the floor, he was crying and visibly shaking as appellant held the four-year old boy's arms down and put his knee down on K.J.'s chest. Appellant yelled at K.J. that, "you can't hurt me. [My] little finger will knock you into next week." Appellant threatened K.J. and said, "[y]ou're going to make me pin you down." "You can escalate this and end up in the bathtub." Appellant told K.J., "[y]ou're not going to get anything but tied up and held down." Appellant asked

15

K.J. if he wanted to be tied up. Appellant told K.J. he knew K.J. did not like to be tied up. Appellant told K.J., "[y]ou're a little kid. I can knock you into next month boy." Appellant blamed K.J. by telling him "[y]ou're the one who caused the problem." Appellant told K.J., "I am going to win." Appellant then yelled at K.J. saying, "[y]ou turned around and acted like a prick." Appellant warned K.J. that, "I'm not going to give up. I'm going to be the same every day." Appellant then threatened K.J., "[y]ou're going to change K.J., one way or the other. I'm going to keep giving you the answers til [sic] you die."

Bell also took from Bawarsky's apartment the clothes bar across the top of the children's bedroom closet. Attached to the clothes bar "was a series of sheets and linens that were tied together in a series of knots that were hanging from the bar." The whole assembly was eventually submitted to the DPS Crime Lab. The DPS Crime Lab serologist described the assembly as resembling a cocoon.

Smejkal testified about the results of the DNA tests she conducted on the stains found on the linens that were part of the cocoon located on the clothes bar. According to Smejkal, Linen Stain A matched K.J.'s DNA. Next, Smejkal testified that Linen Stains B and D revealed a DNA mixture consisting of K.J., K.J.'s sister, appellant, and Bawarsky. Smejkal testified this is not an unexpected result when testing a sheet and it means that all four had touched the linen. As for Linen Stain C, Smejkal testified her analysis revealed a complex mixture and that K.J. and his sister could not be excluded as contributors. Smejkal testified she could not draw any conclusions on whether appellant and Bawarsky were contributors.

On December 28, 2005 Bell was asked by Galveston County Sheriff's sergeants Echols and Putnam to videotape a walk-through statement by Bawarsky in her apartment. As a result of that walk-through, Bell was asked to collect several items from the apartment identified by Bawarsky. Among the items Bell collected was a black trunk from the master bedroom. Bell took the trunk from the apartment and placed it in the Galveston

County Sheriff's Department property room.   Eventually, Bell swabbed the interior of the trunk in an effort to find DNA.   As a result of this effort, Bell collected five evidence swabs from the inside of the trunk.   During his investigation, Bell did not notice any blood inside the trunk or on the items that were inside the trunk.

Smejkal performed a DNA analysis on the five swabs taken from the interior of the black trunk.   Smejkal was unable to obtain DNA profiles from four out of the five swabs. One of the swabs revealed a partial profile consistent with a mixture of all four residents of the apartment: appellant, Bawarsky, K.J., and his little sister.   According to Smejkal, this result reveals only that all four had touched the trunk.

### G.     Sergeant Gary Echols

Echols and Sergeant John Putnam were the investigators assigned by the Galveston County Sheriff's Department to investigate K.J.'s death.   When Echols arrived at the Blackbeard Apartments on the morning of December 22, K.J.'s body was still on the living room floor.   Echols observed that there were knots on K.J.'s head, bruises that appeared to be recently inflicted as well as older bruises, and marks on his chest.   By the time Echols arrived on the scene, appellant and Bawarsky were sitting in separate police vehicles. Echols did not talk with either appellant or Bawarsky at the scene.   Considering K.J.'s death suspicious, Echols' supervisor instructed Putnam to interview Bawarsky and Echols to interview appellant.   The interviews were conducted at the Sheriff's Department offices.

At the time Echols interviewed appellant on December 22, appellant was not under arrest for capital murder or any other charge.   Appellant's December 22, 2005 statement was played for the jury.   In that statement, appellant said K.J. was a daily challenge. Appellant admitted he had been overwhelmed as a result of K.J.'s behavior over the six months since he moved in with Bawarsky.   Appellant told Echols he believed God had

17

called him to help with K.J. Appellant said he would not discipline a child when he was angry. Appellant told Echols K.J. would often throw temper tantrums and have to be physically restrained. Appellant claimed he would restrain K.J. for ten minutes. Appellant also told Echols that K.J. would poke himself in the eyes, pinch himself, claw himself, and bang his head. According to appellant, K.J. regularly banged his head against the wall. Appellant said if K.J. was banging his head, he would move him away from the wall and hold him down. Appellant explained that if K.J.'s tantrums went on too long, he would place him in the shower to calm him down. During the interview, appellant revealed the existence of the Discipline Video to Echols. Appellant explained the reasoning behind the Discipline Video. According to appellant, the videotape was made to show K.J. what he looked like when he threw a tantrum.

Appellant also talked about the events leading up to K.J.'s death. Appellant told Echols that K.J.'s behavior had dramatically worsened in the last three or four days. Appellant was not certain, but he told Echols he may have put K.J. in the shower on December 21. Appellant told Echols he checked on K.J. about 9:00 p.m. and sometime not long after that, K.J. started hollering loud enough to wake his sister. Appellant said he brought K.J. into the living room until he calmed down. Appellant admitted that he laid his chest on top of a pillow that had been placed on top of K.J.'s chest while K.J. was on the floor. At one point during the interview appellant denied placing his entire weight on K.J. that night. Then appellant said he did hold K.J. down, but only for a few minutes. Appellant claimed Bawarsky did not sit on the victim. Appellant said he brought K.J. back to bed between 9:30 and 10:00 p.m. Appellant said he was in bed watching television by 11:00 p.m. Appellant said Bawarsky stayed up after he had gone to bed.

According to appellant, about 2:00 a.m. Bawarsky asked him if he had moved K.J. onto his bed.[9] Appellant told Echols he got up, and both he and Bawarsky went into the

---

[9] Appellant explained that K.J. frequently fell asleep on the floor of his bedroom and they would eventually move him onto his bed.

children's bedroom and found K.J. in the closet. Appellant said K.J. was in a fetal position balled up in his sheets in the closet. According to appellant, Bawarsky noticed there was something wrong, that K.J. was like a dish rag. Appellant explained he then brought K.J. to the master bedroom and put him on the floor. Appellant determined K.J. was not breathing. When appellant started CPR, he noticed a trickle of blood coming out of the corner of K.J.'s mouth. Appellant said he then moved KJ into the apartment living room and did CPR until EMS arrived.

Soon after leaving the Sheriff's Department following his interview with Echols, appellant was arrested on narcotics charges arising from the possession and manufacturing of methamphetamine and for child endangerment arising from the manufacturing of methamphetamine with children in the home. Appellant was brought before a magistrate for the drug and child endangerment cases on December 27, 2005. Appellant asked the magistrate to appoint him counsel on those cases.

On December 28, 2005, while appellant was in custody, Echols and Putnam initiated an interview with appellant. The videotaped interview begins with Echols and Putnam walking into an interview room where appellant was already seated. Putnam then began the interview by admonishing appellant.

> Putnam: I want to try and talk to you; and it's strictly voluntary, voluntary on your part. But before - before we talk, after I have advised you of your rights and you have to waive your rights. Okay?
>
> Appellant: Uh-huh.
>
> Putnam: And I don't want to talk about anything that you are charged with. Okay? I don't want to discuss any of your cases that we've currently filed against you. Okay? Is that clear?
>
> Appellant: (Nods head up and down.)
>
> Putnam: What I'm doing is I'm still investigating [K.J.'s] death.

19

Appellant then asked what the medical examiner found. Putnam responded that K.J. did not die of natural causes.

> Putnam: Let me read this [the admonishments and waiver form] to you; and then, like I said, you can talk to us if you want to. We can't force you to talk to us. And you know that.
>
> Appellant: (Nods head up and down.)
>
> Putnam: Okay? But I - I sure would like to get to the bottom of this little four-year-old boy's death.
>
> Appellant: At any time I want to stop the -
>
> Putnam: Yes, sir, and it will be explained to you in your rights.
>
> Appellant: All right.

Putnam then admonished appellant of his right to remain silent. Appellant nodded he understood and initialed the rights form. Putnam told appellant that he had the right to have a lawyer present. Appellant stated he understood. Putnam told appellant that he had the right to have an attorney appointed. Appellant stated he understood. Putnam told appellant that he had the right to terminate the interview at any time. Appellant stated he understood.

After Putnam asked for appellant's signature and noted the time, the following exchange occurred:

> Appellant: You fellows know I – I've applied for a public defender, which I've not seen or talked to?
>
> Putnam: Okay. That's – that's on your existing cases. Like I said, I don't - it would be unfair for me to discuss your cases with you, okay, because you need an attorney then your attorney represents you. Okay?

Appellant acknowledged he was informed of and understood his rights. Putnam then explained that the form consisted of two parts and the second part requested that appellant waive his rights. Putnam assured appellant he could stop the interview at any time.

20

> Putnam: Like I said, we're not going to discuss anything that you have been charged. Okay? I'm interested in the baby's death.

Appellant responded by stating they were talking about a serious crime. Sergeant Putnam agreed. Appellant said he was implicated, but said he did not know how, but got the sense based on questions he was asked before. Putnam asked appellant if he would ask questions if a 4-year old had died. Appellant agreed he would. Putnam again assured appellant that he was not being forced to answer any questions.

> Appellant: I'll – I'll start the interview. I will possibly call it off.

> Putnam: That's understandable. That's your right.

Appellant said he wanted to get to the bottom of it too, but he had yet to hear anyone say they understand K.J. thrashed himself continually. Putnam told appellant it was obvious the child was hyperactive. Putnam then returned to the waiver form.

> Putnam: But before we continue, like I said, if - if you're willing to talk to us, you just need to sign it. But you can stop at any time.

After appellant signed the waiver form, he said:

> Appellant: All right. I'll – I'll begin the interview. I don't know how far along I'll go, but I – I do want - I do want to have this resolved.

After signing the form, the interview got underway. Appellant told the investigators that K.J. had problems, including an inability to control himself. Appellant admitted he had physically restrained K.J. the evening before he had died because he had started thrashing about.

Appellant told the investigators that he hated to think that anything he did that evening contributed to K.J.'s death. Then, in a rambling fashion, appellant mentioned he assumed K.J. might have suffocated because he was not breathing when they found him. Appellant mentioned two things. First, he told the investigators K.J. had a habit of sticking pins and Lego pieces in his mouth. Second, appellant said K.J. had the habit of

21

bundling himself up in his sheets, which appellant thought might have led to him being suffocated.

Appellant next stated that Bawarsky had always had trouble dealing with K.J. He then said that K.J. had been "on a roll" for the two weeks prior to his death. He said that at the beginning of that period of time, he had gone into the children's bedroom to change K.J.'s sister's diaper and found K.J. fondling her. According to appellant, Bawarsky was devastated by this occurrence.

During this same period of time, appellant recalled Bawarsky calling her mother and telling her she needed to take K.J. Appellant said they were about to leave for Fort Worth for the holidays at the time of his death and he believed K.J. was going to stay with his great-grandmother for awhile to see if she could do anything with him. Later during the interview appellant said he believed the great-grandmother was too old and spoiled the children too much for her to help K.J. According to appellant, K.J. would come back after two months with his great-grandmother and appellant would have lost all the ground he had gained with K.J.

Appellant also mentioned that Bawarsky had had a conversation with Ginger, K.J.'s mother, and had discussed Ginger taking the kids. Upon learning of that conversation, appellant discussed with Bawarsky that Ginger did not want K.J.

Appellant then talked about himself. He told Putnam that he had almost completed a psychology degree and had worked with troubled children for three years at the Mary Lee Foundation.[10] He explained he got out of that line of work because it was tough seeing what the children had been through and wondering how people could treat children that way. Appellant then mentioned that he was not biologically related to K.J. but that he loved the children and believed that God had put him with Bawarsky and it was his duty to

---

[10] The State introduced appellant's transcript from Southwest Texas State University which established appellant was not close to completing a psychology degree at that university. The State also introduced into evidence business records from the Mary Lee Foundation which certified that the custodian of records could not locate any records related to appellant.

be a male role model for K.J. Appellant emphasized he would not do anything to hurt a child.

The interview then turned back to the events leading up to K.J.'s death. Appellant said K.J. was wrapped up in the sheets when appellant went into the children's bedroom to check on him. Following that, Echols showed appellant a photograph of the bedroom closet where appellant claimed he had found K.J. Echols pointed out that there were blankets and sheets tied together on the closet rod. Echols then asked appellant the purpose of that arrangement. Appellant denied tying the items to the closet rod and he was unable to explain its purpose, and he finally denied having any knowledge about it.

Echols then told appellant he had put together what happened that evening. Echols then showed appellant another photograph. Echols then told appellant that he had wrapped K.J. up in sheets; appellant had then placed K.J. into a compartment inside a trunk in the master bedroom where he was left for over an hour. According to Echols, this was where K.J. had suffocated. In response, appellant, looking at the photograph, asked: "What is that?" Appellant finally identified the object in the photograph as a trunk in the apartment's master bedroom. Appellant then denied any awareness of that and finished by stating: "I can't fathom that." The interview then stopped.

### H. Dr. Steven Pustilnik

Dr. Steven Pustilnik is the chief medical examiner for Galveston County. Pustilnik conducted K.J.'s autopsy. Pustilnik testified the manner of K.J.'s death was homicide. He also testified that the cause of K.J.'s death was blunt head trauma, asphyxia, and chronic child abuse. According to Pustilnik, K.J. had no natural diseases. However, K.J. had multiple bruises on his forehead, face, cheek, nose, eyelids, and lips. Pustilnik said the age of the injuries ranged from acute (at or near the time of death) up to weeks old. Pustilnik testified the varying ages of the wounds, from minutes to hours old, were consistent with K.J. being beaten.

23

Pustilnik testified the injury to K.J.'s eyelid was intentionally inflicted and was not caused by a fall. Pustilnik found an abrasion on the left side of K.J.'s forehead. Pustilnik determined that the bruising to K.J.'s nose resulted from something being directed at that area of his face. The bruising on K.J.'s face was also acute; there was no healing. The abrasions on K.J.'s lips were consistent with his lips being pressed forcefully against his teeth. K.J.'s mouth also had a hemorrhage. Pustilnik explained this was indicative of K.J.'s jaw struggling to move.

Pustilnik noted K.J. had a patterned abrasion on the left side of his neck. According to Pustilnik, the abrasion occurred at or near the time of K.J.'s death. Pustilnik testified the injuries indicated that something was wrapped around K.J.'s neck or he was struck with something. Pustilnik pointed out that K.J. had a brown bruise on his collarbone and multiple bruises of varying ages on his chest. K.J. also had abrasions on his chest that showed no healing had occurred. As a result, Pustilnik concluded these occurred near the time of K.J.'s death. Pustilnik identified multiple bruises of different ages on the right side of K.J.'s chest. Pustilnik could clearly see fingerprint abrasions on K.J. K.J.'s left hip had bruises of varying ages. K.J. also had multiple bruises of different ages on his waistline.

K.J. had a striped bruise on his right thigh. Pustilnik said the injury was consistent with K.J. being hit with a strap or a belt. K.J. also had bruising on his legs that varied in age. K.J. also had abrasions on his legs that were indicative of fingertip bruises. Pustilnik said the fingertip bruises occurred when someone grabbed K.J. K.J. had an acute abrasion on the top of one toe. Pustilnik explained that once he flipped K.J.'s body over, he could see multiple bruises of various ages on the back of his arms. According to Pustilnik, none of the arm bruises were consistent with K.J. beating himself up.

Pustilnik also examined the area under K.J.'s scalp. Under K.J.'s scalp, Pustilnik found hemorrhages. According to Pustilnik, this indicated K.J. was struck or flung into something that did not have an edge or sharp feature.

24

Pustilnik explained his finding of chronic child abuse was based on the distribution and microscopic appearance of K.J.'s injuries. Pustilnik explained the multiple injuries made K.J. less able to survive because he could not fully compensate when his breathing was compromised.

Pustilnik explained K.J.'s brain was swollen, which indicated asphyxia. Pustilnik testified K.J. could have asphyxiated from a 180-pound person sitting on his chest. K.J.'s lungs showed pulmonary edema, which is another indication of asphyxiation. K.J. also had broken blood vessels, suggesting that he had struggled to breath against a fixed obstruction, such as socks. According to Pustilnik, this was also indicative of asphyxia.

Pustilnik explained that a blow to the head would impact K.J.'s ability to survive if he was wrapped in sheets and placed in a chest. According to Pustilnik, a decreased level of consciousness would have put K.J. at a greater risk of asphyxia. In addition, Pustilnik testified that, at the time of his death, K.J. had 200 nanograms of diphenhydramine, also known as Benadryl, per milliliter of blood in his system. Pustilnik explained Benadryl is a sedating drug and the amount found in K.J.'s blood was potentially an abusive level of the drug which could have been used to chemically restrain him. According to Pustilnik the expected result of the amount of Benadryl found in K.J.'s blood would be that K.J. would have been sedated.

Pustilnik found that K.J. suffered subarachnoid hemorrhages on both sides of his brain. Pustilnik explained these injuries are indicative of K.J. struggling to breathe. Pustilnik said K.J. would have been in a panic and would have been alive when he suffered these injuries.

Pustilnik testified an adult putting his weight on K.J.'s upper body could cause asphyxiation. Pustilnik said asphyxiation could result from being wrapped in multiple sheets. Pustilnik testified that K.J.'s death was consistent with being wrapped in sheets, with socks in his mouth, and a mesh bag over his head.

Pustilnik testified K.J.'s injuries were consistent with K.J. laying down on a couch and pressure being applied to his head. Pustilnik said K.J. could have struggled against a cushion. The injuries found inside K.J.'s mouth below his gums, were caused by something pressing his lips against his mandible and maxilla. In other words, K.J. was struggling and as a result he was moving the bones in his mouth against his lips while his lips were being held firm by the external obstruction. Pustilnik testified that it was his opinion that K.J.'s injuries were the result of an aggressive act and were not accidental.

Pustilnik also testified that K.J. being wrapped in sheets, the sheets being tightened with straps, then being put in a chest with or without socks in his mouth, would recklessly expose K.J. to serious bodily injury.

### I. Ginger, K.J.'s Mother

Ginger is K.J.'s biological mother and Bawarsky's daughter. Ginger testified that she called her mother during the evening of December 21, 2005 in order to speak with the children. While Ginger did not recall the exact time she made the telephone call, she believed it was about 7:00 p.m. and that it lasted about thirty minutes. Ginger initially asked to speak with K.J. and she was not allowed to speak with him. Bawarsky explained K.J. was in trouble and was already in bed. Ginger testified that later during that same telephone conversation, Bawarsky said something to the effect that K.J. was tied up in the closet and that was how they handled him.

During that same conversation, Ginger testified that Bawarsky wanted her to take K.J. Ginger told her that she could not because CPS had taken them and had placed the children with Bawarsky.

When asked to describe her mother's emotional demeanor that night, Ginger said Bawarsky did not sound like herself, but instead sounded weird or loopy. When asked if she had spoken with appellant during this conversation, Ginger said she had not, but she

did hear appellant singing an Eminem song in the background. Ginger testified she asked Bawarsky what was wrong with them, and Bawarsky told her they were cooking.

Ginger also reported that during the conversation Bawarsky said something like "he was hitting him and calling him a stupid mother fucker." When asked who she meant by "he," Ginger said she was guessing Bawarsky meant appellant. When asked who was getting hit, Ginger said "I'm guessing it meant [K.J.]."

Ginger also testified about several other subjects. She said that Bawarsky had denied appellant was living with her. In addition, Ginger testified that her grandmother, K.J.'s great-grandmother, had been very ill the last few years and was not capable of taking care of K.J. Finally, she characterized her mother as a person who lied about a lot of things.

## II.    Barbara Bawarsky Testimony

Bawarsky testified at length during appellant's trial. During her testimony, Bawarsky admitted that she had lied multiple times throughout the investigation of K.J.'s death. Bawarsky's lies began with the start of the investigation when she told the Jamaica Beach police appellant had found K.J. in the children's bedroom closet. Bawarsky admitted that was a lie and that the reason she had told that story to the police was that appellant had told her to tell that story. Bawarsky said that she made things up during the investigation to support that initial lie, that K.J. was found in the bedroom closet.

Bawarsky testified that she had stopped working in October and that neither she nor appellant were working in December. In addition, Bawarsky testified that the children were not in any type of school or daycare in December. Bawarsky admitted the four of them were home together every day in December and she and appellant disciplined K.J. as described below.

27

During her trial testimony Bawarsky admitted she was using methamphetamine on December 21, 2005. When asked if she knew how much methamphetamine she used that day, Bawarsky said that she "had shot up twice that day and also … had snorted quite often whenever she had the opportunity to." Bawarsky also testified about the efforts of appellant and herself to keep the children in their room. Bawarsky testified they kept a baby gate on the door into the children's bedroom. According to Bawarsky, they did this to keep the children out of the way of her making "dope or using the dope or the aftereffects that had on the dope.…"

Bawarsky's testimony eventually turned to the events leading up to K.J.'s death. Bawarsky had moved with the children to Galveston in January 2005. In July 2005 appellant had moved into the apartment with Bawarsky and the children.

Bawarsky testified K.J. had behavioral problems and was in counseling before appellant moved in with her. Bawarsky testified K.J. hit some of his classmates as well as his teacher with his belt. According to Bawarsky, K.J. was removed from that school. Bawarsky said K.J. saw his mother get choked. Bawarsky testified that K.J. choked his sister. Bawarsky said she choked K.J. to teach him not to choke others. Bawarsky admitted that on different occasions, when she was upset with K.J., she kicked him, pulled his hair, hit him with a belt, and slapped him. Bawarsky testified that despite all of his behavioral issues, K.J. never poked himself in the eyes, pinched himself, or hit his head against the wall.

Bawarsky testified that after appellant moved in, she and appellant jointly disciplined K.J. According to Bawarsky, K.J. was disciplined every day. Bawarsky testified she and appellant commonly disciplined K.J. by hitting him, using a belt on him, slapping him, putting him in time-out in the closet, covering his eyes, yelling at him, and putting him inside a small kitchen cabinet.

Several weeks before K.J.'s murder, Bawarsky said appellant caught K.J. touching his sister. Bawarsky testified that she "lost it." According to Bawarsky, she "lost it completely where [appellant] had to remove me from the room." At that point, appellant told Bawarsky she would not be disciplining K.J. anymore and that he would completely take over that task. Bawarsky testified she was relieved because she "didn't know how to help [K.J.] anymore." Bawarsky said appellant told her he had years of experience with children with far worse behavioral problems than K.J. and led her to believe that he had a degree in psychology. Based on that, Bawarsky let appellant take over disciplining K.J. From that point, Bawarsky testified that, no matter what she saw, she never intervened in appellant's disciplining of K.J.

According to Bawarsky, appellant engaged in discipline sessions with K.J. that appellant called a "behavior modification plan." Bawarsky testified appellant would wrap K.J. in sheets from his head to his toes. Bawarsky explained that wrapping K.J. allowed them to control him and K.J. would eventually tire out. Bawarsky testified appellant would then uncover K.J.'s head and put him between the couch and the wall in the living room. According to Bawarsky, K.J. would be left between the couch and the living room wall for unknown lengths of time.

Bawarsky testified that she and appellant made a videotape of a discipline session in early December. According to Bawarsky, appellant thought they could use the tape to show K.J. how he was acting. The content of the videotaped discipline session is described above. Bawarsky admitted she narrated the videotape.

Bawarsky testified that after appellant took charge of disciplining K.J., he wrapped K.J. in a cocoon of sheets and tied him from the clothes hanger pole in the children's bedroom closet. According to Bawarsky, the cocoon was made out of sheets, blankets, and receiving blankets. Bawarsky testified K.J. was placed in the cocoon on at least one other occasion.

Bawarsky testified that when appellant "would put [K.J.] between the couch and the wall … [appellant] was very boastful, very proud of himself that he had overtaken a child…. But [appellant] was very proud that he was the boss. He had won the match. He had won over [K.J.]. He was very proud of himself." Bawarsky testified appellant's "behavior modification plan" did not appear to be working and she eventually told appellant that he had met his match in K.J. According to Bawarsky, this made appellant very upset.

On the day K.J. was killed, Bawarsky testified she ran errands, which included spending a great deal of time at Wal-Mart. Bawarsky admitted she stole from Wal-Mart that day.[11] Bawarsky returned to the apartment about 6:30 p.m. and appellant told her that he had had a very bad day with K.J. and that K.J. was asleep in bed. Bawarsky testified it was unusual for K.J. to be in bed at that time of the day. Appellant told Bawarsky that he had used the shower twice on K.J. According to Bawarsky, the purpose of placing K.J. in the shower was to shock him into calming down.

Bawarsky testified she and appellant planned "to have sex on the exercise ball" that evening after the children were in bed. According to Bawarsky, K.J. woke up and was interfering with their planned encounter. Bawarsky testified appellant "lost it" that evening.

Bawarsky testified that about 11:00 p.m., K.J. began making noise in his bedroom. According to Bawarsky, appellant stormed into the bedroom, turned on the light, and started yelling at K.J. Appellant then took K.J. out into the living room. Bawarsky testified she settled K.J.'s sister down and then went straight to the kitchen where she started making a meatloaf and preparing to make more methamphetamine.

---

[11] Bawarsky testified she found a cash receipt in the Wal-Mart parking lot. Bawarsky then took the receipt into the store, gathered up the products on the receipt, and exchanged them for a gift card, which she used to purchase Sudafed and gasoline.

While Bawarsky was in the kitchen, appellant wrapped K.J. in sheets. Appellant asked Bawarsky to get him additional binds to tie K.J. in the wrappings. Bawarsky testified she went and got the bindings and took them to appellant. Once K.J. had been wrapped to appellant's satisfaction, appellant placed him on the couch in the living room, put pillows on top of him, and he then sat with his full weight on K.J.'s torso or head. Bawarsky described appellant as yelling at K.J. about being quiet and not coming out of his bedroom. Bawarsky testified appellant told her K.J. was kicking him and hurting him. While sitting on K.J.'s torso or head, appellant twice asked Bawarsky to also sit on K.J. Bawarsky eventually sat with her full weight on K.J.'s legs. Bawarsky testified that she sat on K.J.'s legs long enough to hear appellant yelling at K.J. and K.J. crying out and whimpering. Bawarsky described appellant as more angry than she had ever seen him and she testified appellant was yelling at K.J. and beating the pillows covering K.J. with his fists. After sitting on K.J.'s legs, Bawarsky testified she got up and went back into the kitchen.

At a point in time not exactly clear from her testimony, Bawarsky suggested placing K.J. in the hope chest in the master bedroom. Appellant took the still wrapped K.J. into the master bedroom and placed him inside the hope chest. Once K.J. was closed up in the hope chest, appellant and Bawarsky engaged in sexual relations on the exercise ball.

While appellant and Bawarsky were having sex, Bawarsky heard K.J. call out "Nana." Bawarsky told appellant she needed to check on K.J. but the sexual encounter did not stop at that point. Appellant told Bawarsky he would check on K.J. Bawarsky told appellant once again she needed to check on K.J. At that point, appellant stopped having sex with Bawarsky and went into the bedroom to check on K.J. while Bawarsky returned to the kitchen. Bawarsky estimated appellant was in the back bedroom for an hour and a half. Bawarsky testified she did not hear anything from K.J., but she did hear two loud thumps or bumps come from the bedroom. Bawarsky explained she did nothing in response to those noises because she was making methamphetamine.

31

Bawarsky testified it was in the early morning hours of December 22 that she and appellant went back into the master bedroom to check on K.J. When Bawarsky opened the lid of the hope chest she saw K.J. sitting inside "totally wrapped and there was a mesh bag that was covering pretty much from his head to his body." Bawarsky took K.J. out of the chest, unwrapped him, and placed him on the bedroom floor. Bawarsky testified that when she lifted K.J. out of the chest his face was very pale, there were bruises on his face, and he was still warm. Bawarsky said appellant began doing CPR on K.J. According to Bawarsky, appellant performed the chest compressions while she did mouth to mouth. When Bawarsky commenced mouth to mouth, she noticed blood coming out of K.J.'s mouth and it spilled onto the bedroom carpet.

Bawarsky testified it was at that point in time appellant picked K.J. up and took him into the bathroom where she assumed he was trying to wash the blood off of him. Bawarsky did not immediately follow appellant into the bathroom because appellant instructed her to put the sheets that had been wrapped around K.J. into the washing machine. Bawarsky testified she put the sheets into the washing machine and turned it on. When asked why she had taken the time to do that, she replied she was just doing what appellant told her to do. Once Bawarsky made it into the bathroom, she held K.J. up on the side of the bathtub while appellant splashed water on him.

After several minutes in the bathroom, appellant carried K.J. into the living room with Bawarsky following behind. Appellant placed K.J. on the living room floor. When asked how much time passed between the time when they found K.J. inside the chest to the moment appellant placed K.J. on the living room floor, Bawarsky answered: "It was a long time. It was definitely in the minutes." After appellant brought K.J. into the living room, Bawarsky finally called 9-1-1.

Bawarsky testified she lied to the 9-1-1 dispatcher when she said appellant found K.J. in the bedroom closet. When asked why she had lied, Bawarsky testified appellant "told me to tell them that I found him in the – the bedroom, in the closet in the room."

32

Bawarsky also testified that after the police had arrived at the apartment, appellant was telling her "to tell them about that he was found in the closet." Later on, appellant told Bawarsky she was the one that was supposed to have found K.J. In addition, Bawarsky testified that while they were standing in the master bedroom, appellant instructed her to clean the blood off of the bedroom floor. Bawarsky also discussed the period of time when they were both waiting on the apartment front porch. According to Bawarsky, appellant asked her what she had told the police. When Bawarsky told appellant she had told the police appellant found K.J., he told her "No. No. You're supposed to tell them that you found him." Appellant then told Bawarsky: "You stick with the story. You know, if you stick with the story, we keep the same – the story going, they can't do anything." In addition, appellant told Bawarsky not to mention the hope chest.

Bawarsky was also asked about the socks found in the bedroom drawer. Bawarsky testified she did not know if appellant put socks into K.J.'s mouth that night. Bawarsky testified she lied to the investigators when she told them she put the socks in the drawer. Bawarsky admitted they had previously used socks to keep K.J. quiet.

At the close of the evidence, the case was submitted to the jury and they found appellant guilty as charged. The trial court imposed the mandatory sentence of confinement for life in the Texas Department of Criminal Justice, Institutional Division without the possibility of parole. This appeal followed.

DISCUSSION

Appellant brings three issues on appeal. In his first issue, appellant contends the trial court erred when it denied his motion to suppress his December 28, 2005 statement. In his second issue, appellant asserts the trial court committed jury charge error in three different ways. Finally, in his third issue on appeal, appellant makes two separate arguments. First, appellant challenges the sufficiency of the evidence supporting his conviction. Second, appellant contends there was insufficient evidence corroborating Bawarsky's accomplice witness testimony. We will address both arguments raised in

33

appellant's third issue in turn. *See Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999) (expressly distinguishing sufficiency standards of review from the accomplice witness standard of review under Article 38.14 of the Code of Criminal Procedure).

## I.  Motion to Suppress

In his first issue on appeal, appellant contends the trial court erred when it denied his motion to suppress his December 28, 2005 videotaped statement. According to appellant, the police initiated interview violated both his Fifth and Sixth Amendment rights to counsel.[12]

### A.  The Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court"s findings of historical fact and reviewing *de novo* the trial court's application of the law. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial judge is the exclusive trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony at the suppression hearing. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). As the trier of fact, the trial court is free to believe or disbelieve all or any part of a witness's testimony, even if the testimony is uncontroverted. *Id.*; *Marsh v. State*, 140 S.W.3d 901, 905 (Tex. App.—Houston [14th Dist.] 2004, pet. ref"d). In reviewing a trial court"s ruling on a motion to suppress, an appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). If the trial court's ruling is reasonably supported by the record and is correct under

---

[12] Appellant also mentions in his brief the Texas Constitution's analogs to the Fifth and Sixth Amendments. However, appellant failed to provide any argument or authority that the Texas Constitution provides him greater protection than the United States Constitution. Therefore, we will analyze appellant's first issue using federal constitutional principles. *See Johnson v. State*, 853 S.W.2d 527, 533 (Tex. Crim. App. 1992) (declining to address appellant's arguments regarding his state constitutional rights when the appellant did not make a distinction between the United States Constitution and the Texas Constitution).

any theory of the law applicable to the case, the reviewing court will sustain it upon review. *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996).

## B.      Fifth Amendment Right to Counsel

Appellant begins his first issue by asserting that he adequately invoked his right to counsel at the beginning of the December 28, 2005 police-initiated interview which then required the investigating officers to immediately stop the interview. By failing to do so, appellant argues they violated his Fifth Amendment right to have counsel present during police interrogation.

The Fifth Amendment right to have an attorney present during police interrogation applies to any offense about which the police might want to question a suspect. *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). Among the rights about which the police must advise a suspect whom they have arrested is the right to have counsel present during any police-initiated interrogation. *Id.* Once the suspect has invoked his Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates the dialogue. *Id.*

However, not every mention of a lawyer will suffice to invoke the Fifth Amendment right to the presence of counsel during questioning. *Id.* An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation. *Id.* Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding circumstances. *Id.* The test is an objective one and the suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id.* at 892–93.

Looking at the totality the circumstances, Putnam began the December 28, 2005 interview by telling appellant he wanted to talk about K.J.'s death and he did not want to

discuss the charges that had already been filed against appellant. Appellant responded that he understood and asked about the medical examiner's findings regarding K.J. Putnam told appellant that K.J.'s death was not by natural causes. Putnam then began reading appellant the admonishment form. Putnam told appellant he had the right to remain silent. Appellant again responded that he understood. Putnam told appellant he had the right to have an attorney present or to have one appointed for him. Appellant once again responded that he understood. Putnam told appellant that he could end the interview any time he chose to do so. Appellant told the investigators he understood. When Putnam asked appellant to sign the form acknowledging that he had been informed of his rights, appellant asked the investigators whether they knew he had applied for a public defender and that he had not yet seen or talked to that attorney. Putnam explained to appellant that he had requested counsel on his existing cases. Putnam then said, for the second time, that they were not going to talk about appellant's pending cases. Appellant made no further mention of an attorney until he ended the interview.[13]

Based on the totality of the circumstances, we conclude appellant's allusion to the fact he had requested the appointment of counsel on the drug and child endangerment charges was not a clear and unequivocal invocation of his right to counsel. *See Davis v. United States*, 512 U.S. 452, 462 (1994) (holding that statement "Maybe I should talk to a lawyer" was not a request for counsel); *see also Mbugua v. State*, 312 S.W.3d 657, 664 –66 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (holding that the question "Can I wait until my lawyer gets here?" was not a clear and unambiguous assertion of the right to counsel); *Gutierrez v. State*, 150 S.W.3d 827, 832 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (holding that the question, "Can I have [my attorney] present now?" was an ambiguous question and did not clearly and unequivocally invoke the right to counsel);

---

[13] At the end of the December 28, 2005 interview, appellant stated: "You know, this is – I really need a – seriously need a lawyer before I make any more statements about [Bawarsky] or [K.J.] or anybody or anything." Putnam said okay. Appellant replied, "This is unbelievable." Putnam asked appellant if he wanted to end the interview. Appellant said that he did and the investigators stopped the interview at that point.

*Halbrook v. State*, 31 S.W.3d 301, 304 (Tex. App.—Fort Worth 2000, no pet.) (holding that the statement: "Do I get an opportunity to have my attorney present?" did not constitute a clear and unambiguous invocation of the right to counsel); *Flores v. State*, 30 S.W.3d 29, 34 (Tex. App.—San Antonio 2000, pet. ref'd) (holding that the question "Will you allow me to speak to my attorney before?" was not a clear and unambiguous invocation of the right to counsel).   Because appellant did not clearly and unambiguously request counsel at the beginning of the interview, Putnam and Echols were under no obligation to halt the interview or seek clarification from appellant.   *Gobert*, 275 S.W.3d at 892.

We conclude the trial court did not err when it denied appellant's motion to suppress to the extent it was based on the Fifth Amendment right to counsel.

### C.    Sixth Amendment Right to Counsel

With regard to his Sixth Amendment argument, appellant contends that once he had invoked his right to counsel on the drug and child endangerment charges, those protections applied to the police investigation of K.J.'s murder because the charged offenses were inextricably factually intertwined with K.J.'s murder.

In his brief, appellant cites to the Supreme Court case of *Texas v. Cobb* and he candidly concedes that this binding precedent does not support his position.   *See Texas v. Cobb*, 532 U.S. 162, 167–68 (2001) (holding that the Sixth Amendment guarantee of the assistance of counsel once an adversarial proceeding has been initiated and at any subsequent critical stage of the proceeding is offense specific).   As a result of this binding precedent, the Sixth Amendment does not prevent the police from asking about an offense different from the offense where the suspect has invoked his right to counsel.   *Cobb v. State*, 85 S.W.3d 258, 263–64 (Tex. Crim. App. 2002).   "In other words, the invocation of the right *viz* one charge or prosecution does not encompass all future, yet distinct, offenses and prosecutions therefor."   *Romo v. State*, 132 S.W.3d 2, 4 (Tex. App.—Amarillo 2003, no pet.).

Therefore, the critical inquiry is whether the offenses at issue are the same. *Cobb*, 85 S.W.3d at 264, *Romo*, 132 S.W.3d at 4. This determination is made by applying the test first announced in *Blockburger v. United States*, 284 U.S. 299, 304 (1932). *Cobb*, 85 S.W.3d at 264, *Romo*, 132 S.W.3d at 4. Under the *Blockburger* test, the offenses are the same if they are established by the same facts; if one offense requires proof of a fact the other does not, then they are not the same. *Cobb*, 85 S.W.3d at 264; *Romo*, 132 S.W.3d at 4.

The purpose of the December 28 interview was to investigate K.J.'s death, an investigation that ultimately resulted in capital murder charges against appellant. At the time of the interview, appellant had been charged with drug and child endangerment charges. Capital murder requires proof of a fact the drug and child endangerment charges do not: the murder of an individual under the age of six. *Compare* Tex. Penal Code Ann. § 19.03(a)(8) (West 2011) *with* Tex. Health & Safety Code Ann. §§ 481.102(6), 481.112 (West 2010) ("a person commits an offense if the person knowingly manufactures, delivers, or possesses with intent to deliver [methamphetamine]."), *and* Tex. Penal Code Ann. § 22.041(c-1)(1) (providing it is presumed that a person places a child in imminent danger of death, bodily injury, or physical or mental impairment if that person manufactures methamphetamine in the presence of a child). Because capital murder requires proof of a fact the drug and child endangerment charges do not, they are not the same and the Sixth Amendment right to counsel did not prevent Putnam and Echols from interviewing appellant on December 28, 2005.

We conclude the trial court did not err when it denied appellant's motion to suppress to the extent it was based on the Sixth Amendment right to counsel. Having addressed and rejected both arguments raised by appellant in his first issue, we overrule his first issue.

## II. Jury Charge Error

As already mentioned, in his second issue, appellant asserts the trial court committed jury charge error in three different ways. First, appellant contends the

38

evidence was insufficient to include party or co-conspiracy language in the jury charge because appellant argues it was the State's theory of the case that appellant was the principal actor in K.J.'s death. In his second argument under his second issue, appellant asserts the trial court created a material variance with the indictment when it included in the charge a separate unindicted offense: conspiracy to unlawfully restrain K.J. Finally, appellant contends the trial court committed charge error "by not requiring the jury to be unanimous on any of the alternative theories."

### A. Standard of Review

An appellate court's first duty in analyzing a jury charge issue is to decide whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). If the reviewing court finds error, it then analyzes that error for harm. *Id.* Preservation of charge error does not become an issue until the reviewing court reaches the point where it must assess harm. *Id.* The degree of harm necessary for reversal depends on whether the appellant preserved the error by objection. *Id.* Under *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985), jury charge error requires reversal when the defendant has properly objected to the charge and the reviewing court finds "some harm" to his rights. *Id.* In other words, a defendant must have suffered some actual, rather than theoretical, harm from the error. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986). When a defendant fails to object or states he has no objection to the charge, a reviewing court will not reverse unless the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 743–44. "Egregious harm" is generally defined as being such harm that a defendant has not had a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. Thus, an appellate court reviews alleged charge error by considering two questions: (1) whether error existed in the charge; and (2) whether sufficient harm resulted from the error to compel reversal. *Ngo*, 175 S.W.3d at 744.

**B.    Law of Parties**

In his first sub-issue, appellant asserts the State's theory of the case was that appellant was the principal actor in K.J.'s murder. Appellant then continues by arguing that there was no evidence to support the trial court instructing the jury on the law of parties.

Under the law of parties, a "person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code Ann. § 7.01(a) (West 2011). A person is "criminally responsible" for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* at § 7.02(a)(2). A person is also "criminally responsible" for an offense committed by the conduct of another when "in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators … if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy." *Id.* at § 7.02(b). The Penal Code abolished all traditional distinctions between accomplices and principals, and provides that "each party to an offense may be charged and convicted without alleging that he acted as a principal or accomplice." *Id.* at § 7.01(c). The law of parties does not need to be pleaded in the indictment. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). "In general, an instruction on the law of parties may be given to the jury whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564–65 (Tex. Crim. App. 1999).

The evidence recounted above in the fact section of this opinion raised an issue as to whether K.J.'s murder was the result of appellant acting alone or appellant acting in conjunction with Bawarsky. As a result, we conclude the trial court did not commit error when it instructed the jury on the law of parties.

40

## C.    Conspiracy

In his second sub-issue, appellant contends the trial court erred by including an instruction for conspiracy to commit unlawful restraint.   Appellant argues the conspiracy was an unindicted offense and was not a lesser included offense of capital murder. Consequently, appellant contends including conspiracy in the jury charge created a material variance between the indictment and the charge.

Despite appellant's argument to the contrary, the jury was not instructed on criminal conspiracy.[14]   Instead, the jury was instructed on the law of parties as one possible means by which it could convict appellant of capital murder, the charge included in the indictment.   The instruction included an explanation on criminal responsibility for the anticipated result of a conspiracy to commit a felony.   The indictment is not required to include the law of parties and the law of parties may be included in the jury instruction if the evidence supports the submission of the instruction as a possible means by which the crime was committed.  *Marable v. State*, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002). The failure to allege the law of parties in the indictment also does not violate due process. *Id.*   As a result, we conclude the trial court did not commit error when it included an instruction for conspiracy to commit unlawful restraint in the jury charge.

## D.    Unanimous Verdict

In his final sub-issue, appellant contends the trial court's charge allowed the jury to convict him of either capital murder or the allegedly unindicted criminal conspiracy charge.   Appellant contends that because what he considers two separate offenses were charged in the disjunctive, the trial court erred by failing to instruct the jury that they must unanimously agree on which offense they were convicting him of.

Once again, despite appellant's argument to the contrary, appellant was charged only with capital murder and only capital murder was submitted to the jury.   In a capital

---

[14] *See* Tex. Penal Code Ann. § 15.02 (West 2011) (defining criminal conspiracy).

murder prosecution, the different legal theories of criminal liability involving the same victim are alternative methods of committing the same offense and are not different offenses. *Huffman v. State*, 267 S.W.3d 902, 905 (Tex. Crim. App. 2008). It is proper for an indictment to allege different means of committing the same offense and for the jury to be charged disjunctively. *See Kitchen v. State*, 823 S.W.3d 256, 258 (Tex. Crim. App. 1991) (charge properly listed two alternative underlying felonies to support capital murder conviction). When a trial court submits alternative theories supporting the defendant's commission of the same offense to the jury in the disjunctive, it is appropriate for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted. *Id.* Unanimity regarding the specific means by which the defendant committed a crime is not necessary. *Id.*; *See also Gamboa v. State*, 296 S.W.3d 574, 583–84 (Tex. Crim. App. 2009) (discussing the "prevailing view" that alternate legal theories supporting conviction for capital murder do not require unanimity because the trial court cannot impose multiple convictions and sentences for variations of murder when only one person was killed).

A jury is not required to choose unanimously between alternative theories of primary or party liability for murder if (1) either theory is proved; and (2) the alternate theories do not constitute multiple criminal acts. *See, e.g. Randall v. State*, 232 S.W.3d 285, 294 (Tex. App.—Beaumont 2007, pet. ref'd) (jury not required to choose unanimously between theories of principal, party, or co-conspirator to convict appellant of capital murder); *Holford v. State*, 177 S.W.3d 454, 461–62 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (jury not required to choose unanimously between theories of primary or party liability to convict appellant of capital murder); *Hanson v. State*, 55 S.W.3d 681, 693–95 (Tex. App.—Austin 2001, pet. ref'd) (jury not required to choose unanimously between different theories of party liability for capital murder so long as either theory was proved because different theories supporting criminal liability for same murder do not constitute multiple offenses). Because the jury was not required to unanimously agree on the method by which appellant incurred criminal liability for K.J.'s

42

death, the trial court was not required to instruct the jury to find appellant guilty according to a single theory.

Having addressed and rejected each argument raised by appellant in his second issue, we overrule his second issue on appeal.

## IV.    Sufficiency of the Evidence

In his third issue on appeal appellant again makes two separate arguments.   First, appellant asserts the evidence is insufficient to support his conviction.   Second, appellant contends Bawarsky's accomplice witness testimony was not corroborated as required by Article 38.14 of the Texas Code of Criminal Procedure.   We address each argument in turn.

### A.    The Standard of Review and Applicable Law

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).   The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness' testimony.   *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998).   The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit.   *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).   Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction.   *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986).   An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder.   *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000).   Inconsistencies in the evidence are resolved in favor of the verdict.

43

*Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

Appellant was charged with the offense of capital murder. A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code Ann. § 19.02(b)(1) (West 2011). A person commits capital murder if he commits the offense of murder as defined in section 19.02(b)(1) and the person murders an individual under the age of six. Tex. Penal Code Ann. § 19.03(a)(8).

We have already discussed the law of parties above. Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Salinas v. State*, 163 S.W.3d 734, 739–40 (Tex. Crim. App. 1995); *Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994). In determining whether a defendant participated in a crime as a party, the jury may examine the events occurring before, during, and after the commission of the offense and may rely on actions of the defendant that show an understanding and common design to commit the offense. *Ransom*, 920 S.W.2d at 302. Additionally, circumstantial evidence may be used to prove party status. *Id.* The reviewing court must uphold the verdict if the evidence is sufficient under any of the alternative theories included in the charge. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

**B.     Analysis**

In the first part of his third issue, appellant argues the evidence is insufficient to support his conviction in two ways. First, appellant argues that because the evidence did not establish that Bawarsky was the principal actor in K.J.'s death, the State was required to prove appellant was the principal. Appellant then contends the evidence is insufficient

44

to prove he was the principal. Second, appellant argues the evidence is insufficient to prove his intent to kill K.J. According to appellant, his actions on the night of December 21-22, 2005 were nothing more than a routine of abuse that he had inflicted on K.J. numerous times in the past. Appellant then argues he did not intend to kill K.J. that night because he merely subjected K.J. to the same abuse K.J. had suffered, and lived through, before.

We conclude the record contains abundant evidence supporting appellant's conviction as the principal actor in K.J.'s murder. This evidence includes the fact appellant was with K.J. the night he was killed. The evidence also establishes that appellant and Bawarsky both regularly abused the victim over an extended period of time. By his own admission, on the day and night of K.J.'s murder, appellant put his weight on K.J. and wrapped him in sheets. Pustilnik testified these acts alone were sufficient to asphyxiate K.J. It was also determined that the bloody ball of four socks recovered by the police contained DNA matching K.J.'s. Pustilnik testified K.J. suffered injuries consistent with socks or some other object being stuffed into his mouth. Pustilnik also testified this could have caused K.J. to suffocate. In addition, Bawarsky testified she had previously used socks stuffed into K.J.'s mouth to quiet him down, but while she admitted doing many other things to K.J. that evening, she denied having any knowledge of socks being used that night. Based on this evidence, the jury could reasonably have believed appellant knowingly or intentionally caused K.J.'s death by stuffing the ball of socks into K.J.'s mouth before wrapping him in sheets, then beating him on the couch, and finally shutting him up in the hope chest in the master bedroom where he was left for at least an hour.

We turn next to appellant's argument that the State did not prove his intent to kill K.J. For the State to prove appellant committed capital murder, it was required to prove he intentionally or knowingly caused K.J.'s death. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). Proof of a culpable mental state almost invariably depends

upon circumstantial evidence. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Id.* In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id.* Additionally, a culpable mental state can be inferred from the acts, words, and conduct of the accused. *Id.*

We begin with the relative size and strength of appellant and K.J. K.J. was four-years old at the time of his death. Pustilnik testified he measured K.J. and determined he was 37 inches long and weighed 33 pounds. The record discloses that appellant, an adult male weighing something in the vicinity of 180 pounds, vastly outweighed and the jury could reasonably infer he was vastly stronger than K.J.

The record also discloses that the medical first responders and the police officers who had an opportunity to view K.J. laying on the apartment floor, testified that he was covered in bruises, had blood on him, and had knots on his head. Putilnik testified the cause of K.J.'s death was blunt head trauma, asphyxia, and chronic child abuse. Pustilnik also testified that K.J. had multiple bruises, both old and new, over many areas of his body. Pustilnik determined K.J. had injuries that established K.J. had been brutalized prior to and up to the time of his death.

The jury viewed the Discipline Video in which appellant held a visibly shaking K.J. down, placed his knee on K.J.'s chest, and threatened "[y]ou're going to change K.J., one way or the other. I'm going to keep giving you the answers til [sic] you die."

The evidence also established that on the night K.J. died, appellant wrapped K.J. in sheets, possibly with a ball of four socks stuffed into his mouth, placed a couch cushion on top of K.J. and then sat on top of him; beat K.J. with his fists through the couch cushion, then placed a still wrapped K.J. inside a chest, closed the lid, and left him there for at least an hour.

46

The jury also heard the upstairs neighbor's testimony that he was awakened by a loud noise that sounded like someone hitting a wall in the apartment beneath him. Pustilnik testified K.J. suffered hemorrhages under his scalp that indicated K.J. was struck or flung into something that did not have an edge or sharp feature. They also heard the neighbor testify that he heard "hollering and screaming coming from below" his apartment. According to the neighbor, it sounded "just like they were fighting bloody murder." The neighbor then heard vulgar screaming coming from the apartment beneath him.

The jury also heard evidence that appellant kept trying to talk to Bawarsky the morning of December 22, 2005 in an effort to convince her of what story to tell the police. In addition, the jury also heard Bawarsky's testimony that appellant, while the police were investigating K.J.'s death, instructed her to clean the blood from the master bedroom floor.

Collectively, the evidence shows K.J. suffered a particularly brutal and ferocious death and that appellant made some efforts to conceal that fact. We conclude the evidence is sufficient to prove appellant's intent to kill K.J.

Additionally, a defendant in a capital murder case may be convicted solely on a conspiracy theory of culpability contained in the jury charge. *Love v. State*, 199 S.W.3d 447, 452 (Tex. App.—Houston [1st Dist.] 2006, pet. ref' d) (citing *Fuller v. State*, 827 S.W.2d 919, 932–33 (Tex. Crim. App. 1992)). As such, the State was not required to present evidence of appellant's intent to kill as long as evidence established that K.J.'s murder was committed as a result of appellant's conspiracy with Bawarsky to commit unlawful restraint and he should have anticipated the murder in carrying out the conspiracy to commit unlawful restraint. *See Ruiz v. State*, 579 S.W.2d 206, 209 (Tex. Crim. App. 1979). The jury charge tracked the Penal Code and defined unlawful restraint as recklessly exposing K.J. to a substantial risk of serious bodily injury. *See* Tex. Penal Code Ann. § 20.02 (West 2011).

The Discipline Video, the photographs of K.J. wrapped in sheets and sitting blindfolded in a chair, the DNA evidence, the medical examiner's testimony, appellant's

statements, the neighbor's testimony, and Bawarsky's testimony establish a prolonged history of abuse committed by both appellant and Bawarsky. The evidence establishes appellant and Bawarsky were working together to discipline K.J. The discipline included unlawful restraint. Appellant and Bawarsky repeatedly beat K.J. They also repeatedly wrapped K.J. in sheets. They sat on K.J. They put K.J. inside a small chest and closed the lid on top of him. Additionally, Pustilnik testified that sitting on K.J.'s chest, wrapping him in sheets, with or without socks stuffed into his mouth, and putting him in a chest, could have caused K.J.'s death.

The jury, relying on the evidence, could reasonably infer that appellant, by participating in the above actions, should have anticipated that someone, be it himself or his co-conspirator (an irrelevant distinction under section 7.02(b)), would intentionally or knowingly cause K.J.'s death in furtherance of the unlawful restraint. *See* Tex. Penal Code Ann. § 7.02(b) (providing that "all conspirators are guilty of the felony actually committed").

We hold the evidence is sufficient to convict appellant of capital murder as either a principal or as a party. Because the evidence is sufficient, we overrule the first part of appellant's third issue.

### IV.    Corroboration of Accomplice Witness Testimony

We turn now to the second part of appellant's third issue: whether Bawarsky's accomplice witness testimony is sufficiently corroborated to serve as a basis for appellant's conviction.

### A.    The Standard of Review and Applicable Law

A conviction cannot be secured upon the testimony of an accomplice witness unless corroborated by other evidence tending to connect the defendant to the offense. *Cocke v. State*, 201 S.W.3d 744, 747 (Tex. Crim. App. 2006). Article 38.14 of the Texas Code of Criminal Procedure provides: "A conviction cannot be had upon the testimony of an

accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." *Delacruz v. State*, 278 S.W.3d 483, 487 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (quoting Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005)). The Court of Criminal Appeals, in interpreting Article 38.14, has held it is not necessary that the corroborating evidence directly connect the defendant to the crime or that it be sufficient by itself to establish guilt; the corroborating evidence need only tend to connect the defendant to the offense. *Id.* (citing *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999); *McDuff v. State*, 939 S.W.2d 607 (Tex. Crim. App. 1997)). When determining whether non-accomplice evidence tends to connect a defendant to the offense, the Court of Criminal Appeals has stated that the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that the evidence sufficiently tended to connect the defendant to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). When analyzing a challenge to the sufficiency of corroborative evidence, an appellate court views the evidence in the light most favorable to the jury's verdict. *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). Thus, when there are conflicting views of the evidence, one tending to connect the defendant to the offense and one that does not, a reviewing court will defer to the factfinder's resolution of the evidence. *Id.* For that reason, "it is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).

The test for sufficient corroboration of accomplice testimony is to eliminate from consideration the accomplice testimony and then examine the other inculpatory evidence to ascertain whether the remaining evidence tends to connect the defendant with the offense. *Delacruz*, 278 S.W.3d at 487. A reviewing court cannot examine the corroborating evidence piecemeal; instead it must consider the combined force of all of the non-accomplice evidence that tends to connect the defendant to the offense. *Smith*, 332 S.W.3d at 442. When examined in that light, the cumulative effect of suspicious

circumstances may be enough to tend to connect the defendant to the charged offense even if they are insufficient to do so when examined individually. *Yost v. State*, 222 S.W.3d 865, 872 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Viewed collectively, even otherwise insignificant incriminating circumstances may tend to connect a defendant to a crime he is accused of committing. *Id.* Thus, proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Smith*, 332 S.W.3d at 443.

After eliminating Bawarsky's accomplice witness testimony, we conclude that the non-accomplice evidence is sufficient to tend to connect appellant to K.J.'s murder. This non-accomplice evidence includes, but is not limited to, appellant's December 22, 2005 statement placing him alone with K.J. for most of the day prior to his death. Appellant's statement also places him with Bawarsky and K.J. in the apartment the entire night of December 21-22, 2005. Appellant admitted that he had physically restrained K.J. in the past and that he had wrapped K.J. in sheets the night of his death. Appellant also admitted laying on K.J. that night. Both appellant's and K.J.'s DNA were found in the apparent blood stains located in the bathtub and on the carpet in the master bedroom. In addition, Sergeant Hubble overheard appellant tell Bawarsky K.J.'s death was his fault, not hers.

Accordingly, we overrule appellant's third issue on appeal.

## CONCLUSION

Having overruled appellant's issues on appeal, we affirm the trial court's judgment.


/s/     John S. Anderson
Justice

Panel consists of Justices Anderson, Seymore, and McCally.
Do Not Publish — TEX. R. APP. P. 47.2(b).